

U.S. Department of Justice

United States Attorney
Eastern District of New York

GMP:ABK
F. #2013R01789

271 Cadman Plaza East
Brooklyn, New York 11201

December 22, 2016

By Hand and ECF

The Honorable Lois Bloom
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Joseph Asmar
                  Criminal Docket No. 15-491 (ENV)

Dear Judge Bloom:

        The government respectfully submits this letter in anticipation of the defendant's arraignment and detention hearing scheduled for December 23, 2016, at which the government will move for a permanent order of detention.

        The defendant, a Lebanese national who resides in Lebanon, is charged in a two-count indictment, filed on October 1, 2015, charging (i) money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); and (ii) money laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(B).  The defendant was arrested in France while traveling to Paris in October 2015, and he has been held in French custody ever since.  In accordance with a request by the United States government, French authorities extradited the defendant following legal proceedings in France, during which the defendant was represented by counsel.

        As detailed below, the defendant poses a risk of flight that cannot be mitigated by any condition or combination of conditions of release.  Specifically, the defendant (i) faces a significant term of imprisonment, (ii) lacks ties and lawful immigration status in the United States, (iii) has extensive international ties, and (iv) has access to financial resources and cash through a network of criminal associates abroad.  Moreover, given the defendant's statements about his ties to Hezbollah—a foreign terrorist organization—and individuals interested in purchasing weapons (discussed below), he presents a danger to the community.

I.  Background

The government proffers the following facts in support of its motion for a permanent order of detention.[1]

The money laundering charges against the defendant, Joseph Asmar, arise from a Drug Enforcement Administration ("DEA") undercover operation. In approximately October 2013, a confidential source ("CS1") working with the DEA and posing as an individual who works with drug traffickers, was offered money laundering services by Asmar's co-conspirator ("Co-conspirator #1"). Specifically, Co-conspirator #1 offered CS1 his/her services in laundering narcotics proceeds for CS1. Co-conspirator #1 stated that s/he had associates in Lebanon, including a lawyer (later identified as Asmar), who could arrange to launder drug proceeds through a financial institution in Lebanon. CS1 later introduced Co-conspirator #1 to a DEA undercover agent (the "UC") and a second confidential source ("CS2") working with the DEA.

In November 2014, the UC and CS2 spoke with Asmar and Co-conspirator #1 via a Skype call. During the lawfully-monitored and recorded conversation, the UC and CS2 discussed the possibility of the UC and CS2 meeting with Asmar in person. Following this call, in March 2015, CS2 met with Asmar and Co-conspirator #1 in Paris, France. This meeting was surveilled and photographed by the French Police, in coordination with the DEA. The purpose of the meeting was to finalize the details relating to the delivery and laundering of approximately $250,000, in Euros, that were represented to be narcotics proceeds. During the meeting, CS2 informed Asmar and Co-conspirator #1 that his/her associates would be importing a shipment of narcotics into Belgium and, therefore, would have additional narcotics proceeds for Asmar and Co-conspirator #1 to launder. Asmar and Co-conspirator #1 indicated that they would be able to assist CS2's drug trafficking associate.

In March 2015, the UC gave Co-conspirator #1 approximately €214,460 (approximately $250,000) in cash, in a bag. Later that month, the same amount of money, less a 20 percent commission that had been agreed upon between the UC, Asmar and Co-conspirator #1, was received in a DEA undercover bank account.

---

[1]   Evidentiary rules do not apply at detention hearings and the parties are entitled to present evidence by way of proffer, among other means. 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same).

Thereafter, in a series of recorded conversations and meetings that took place in Brooklyn, New York in June 2015, Asmar discussed his money laundering network that spanned the globe and provided money laundering services in parts of the Middle East, Europe, Africa, South America, and cities across the United States. Asmar indicated that he had access to Lebanese financial institutions and knew how to make large amounts of money appear to be legitimately-derived. During those meetings, the UC and CS2 made it clear that they were drug traffickers who needed to launder narcotics proceeds. The UC and CS2 told Asmar that they could obtain a "contract" for laundering up to $8 million in narcotics proceeds, and Asmar informed the UC and CS2 that he would charge a 20 percent commission for providing money laundering services. Asmar also mentioned that he was associated with Hezbollah and stated that his "people" could provide security for narcotics shipments at transshipment points in Africa and the Middle East. Asmar also told the UC and CS2 that he was looking to purchase thousands of handguns and heavy weapons for his associates.

Following the June 2015 meetings, the UC and Asmar maintained communications and agreed to conduct a bulk money transaction of represented narcotics proceeds in Belgium. Asmar agreed to a 12 percent commission fee for arranging the transaction. In September 2015, the UC handed $150,000 worth of Euros to two of Asmar's associates. After dropping the money off to Asmar's associates, the UC notified Asmar via text message that the UC had delivered the Euros, and that all had gone well with the transaction.

II. Argument

A. Legal Standard

Under the Bail Reform Act, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant either poses risk of flight or a danger to the community. 18 U.S.C. § 3142(e) (detention warranted where "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. Ferranti, 66 F.3d at 542.

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the evidence of the

3

defendant's guilt, and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

    B. Discussion

For the following reasons, the government respectfully submits that a preponderance of the evidence shows that the defendant presents a serious risk of flight and, moreover, he presents a danger to the community.

    1. Nature and Circumstances of the Crimes Charged

As detailed above, the defendant has been charged with conspiracy to launder money and money laundering. The defendant's crimes involved planning and coordination with multiple co-conspirators, access to financial institutions in various continents, and a network of money launderers and criminal associates around the world. Indeed, by his own account, the defendant is able to launder money in parts of the Middle East, Europe, Africa, South America and cities across the United States, and he has connections to members of Hezbollah, a designated foreign terrorist organization.

Moreover, the crimes with which the defendant is presently charged carry heavy penalties. The charged money laundering offenses carry a statutory maximum of 20 years of imprisonment, and an estimated advisory Guidelines range of 97 to 121 months' incarceration, based on the government's current estimate.

    2. History and Characteristics of the Defendant

In addition to the serious charges that the defendant faces in the instant prosecution, his prior history and characteristics establish his inherent risk of flight that cannot be mitigated by any condition or combination of conditions of release. The defendant was born in Lebanon, is a Lebanese citizen and has no immigration status in the United States. The defendant has been extradited in custody and paroled into the United States for prosecution. He was arrested in France, where he has limited ties, and he has a documented history of extensive international travel.

Moreover, on the recordings of his meetings with the DEA undercover agent, the defendant discussed his ties to criminal associates and connections with individuals in Lebanon, various countries in Africa and throughout Europe. The defendant also discussed with the undercover agent his connections to Hezbollah. Notably, many countries to which the defendant has ties, including his native Lebanon, do not have extradition treaties with the United States.

The defendant has the means, motive and opportunity to flee the country and should be detained without bail. See United States v. Stanford, 341 F. Appx. 979, 983 (5th Cir. 2009) (holding that the defendant's financial resources, international network and frequent foreign travel supported the district court's determination that the defendant was a flight risk and should be detained); United States v. Botero, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) (finding pretrial detention warranted where the defendant had "considerable means and foreign connections which would make it possible for him to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences"); see also United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir. 1990) (The government established by a preponderance of the evidence that no condition or set of conditions will reasonably assure defendant's presence at trial because his ties to the community did not outweigh the presumption plus the evidence of his financial assets outside the country and his family ties to Honduras, particularly in light of the potential maximum sentence of life plus sixty years that he faced under the indictment).

Additionally, the Court should decline to consider elaborate conditions of home detention as a substitute for pretrial detention. As the Second Circuit observed in United States v. Millan:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted); see also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

### 3. Weight of the Evidence of Guilt

Where the evidence of guilt is strong, it provides "a considerable additional incentive to flee." Millan, 4 F.3d at 1046; see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"). Here, the evidence against the defendant is strong. As noted above, most of the conversations during which the defendant discussed his money laundering capabilities were recorded and/or were with an undercover DEA agent. At times, meetings were surveilled by law enforcement officers, in the United States and France.

Given the strength of the evidence against the defendant and the significant penalty he faces upon conviction, the defendant has a powerful incentive to flee.

    4.   <u>Danger to the Community</u>

The danger to the community posed by the defendant's release is also demonstrated by his stated connections to Hezbollah and his stated desire to procure handguns and heavy weapons for associates abroad. The defendant's discussions with the UC regarding specific types of weapons bear the hallmarks of a person who is knowledgeable and experienced in arms dealing, not a first-time neophyte.

III.   <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that a permanent order of detention be entered with respect to the defendant, Joseph Asmar.

In the event that the Court is inclined to release the defendant over the government's objection, the government respectfully requests that any such release order be stayed, pursuant to 18 U.S.C. § 3142(f), pending the government's request for a detention hearing before the assigned District Judge.

    Respectfully submitted,

    ROBERT L. CAPERS
    United States Attorney

By:    /s/
    Gina M. Parlovecchio
    Ameet B. Kabrawala
    Assistant U.S. Attorneys
    (718) 254-6317/6001

cc:   Sanford Talkin, Esq. (by ECF and email)
    Counsel to Defendant