**TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.**
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042

410-964-0300

December 21, 2014

NEW JERSEY OFFICE:
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NJ 07311

201-342-6665

Honorable Eric N. Vitaliano
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

**BY HAND AND ECF**

            Re:  United States v. Joseph Asmar
                15 Cr. 491 (ENV)

Dear Judge Vitaliano:

    Defendant Joseph Asmar ("Asmar") respectfully submits this letter as a Sentencing Memorandum for the Court's consideration in determining his appropriate and reasonable sentence. Defendant does not object to the United States Sentencing Guidelines ("Guidelines") calculation set forth in the Presentence Investigation Report ("PSR"). For all the reasons set forth in detail below, defendant respectfully submits that a sentence well below the applicable guidelines range, is sufficient, but not greater than necessary, to satisfy the sentencing goals set forth in 18 U.S.C. § 3553(a).

**PERSONAL BACKGROUND**

    Joseph Asmar, age 44, is a Lebanese citizen, husband and father of two young children, ages 8 and 3. PSR ¶ 31, 33. Prior to his arrest in this case, he was a practicing attorney in Lebanon. PSR ¶ 45. The instant case represents defendant's first contact with any criminal justice system other than in a professional capacity. PSR ¶ 25,26. He was extradited to the United States on December 23, 2016 from the Fresnes Prison in Fresnes, France ("Fresnes"). As discussed in detail below, the conditions in that prison are notoriously harsh. PSR ¶ 36.

    Defendant's conduct in the instant case was significantly out of character. Asmar

1

was a hard-working father, dedicated family man and a contributor to professional and religious communities. Although his conduct was not "aberrant" as defined in the Guidelines and downward departure jurisprudence, Asmar's criminal behavior in the instant case was aberrant as that word is defined in common lexicon. Growing up in Lebanon as a Christian was difficult and required perseverance. In the early eighties, while Lebanon was in the throes of a violent civil war and simultaneous conflict with Israel, Asmar's family was forced to flee Lebanon and took refuge in France. PSR ¶ 35. During this war, many Christians were assassinated because of their divergent religious beliefs. While in France, defendant obtained the equivalent to a high school diploma even though he was learning in a second language. PSR ¶ 42. After the wars were settled in the early nineties, defendant's parents returned the family to Lebanon. PSR ¶ 35. Upon his return, Asmar completed his education and obtained a law degree from La Sagesse Higher Institute in Beirut, Lebanon in 1995. PSR ¶ 42. After four years as a trainee lawyer, he was admitted to the bar as a full attorney in 2001.[1] Colleague Joseph Sami Farah describes Asmar as "a respectable person working in a very high level of professionalism … proven to be a successful lawyer caring for the interest of his clients." Client Jack Abi Mansour informs the Court that defendant has "a very strong work ethic and he is wise beyond his years." Another client, Rozy El Lahibi, writes, "I appreciated his honesty and transparency so much that we became friends and I met his family …" Fellow attorney and the Mayor of the nearby Village of El Kneiss Tony Rizkallah, describes defendant as "known for good behavior, his multiple service and his social activities." Asmar acknowledges that by his irresponsible conduct in the instant case he has destroyed his hard-earned reputation and thrown away all that he has worked so diligently to achieve. Defendant knows that "it will not be easy for me as a lawyer again and mostly it will be impossible."[2] This self-inflicted reality is particularly disappointing since "it was too hard for me to become a good lawyer in Lebanon as a man from a Christian minority."

However, this disappointment concerning his professional losses pales in comparison to the anguish Asmar has caused to those he cares about the most. He did not realize the ramifications of his conduct upon his loved ones and writes, "I'm ashamed from myself and I learned a very big lesson in life. I hurt my kids, my family my Dad, my Mum and myself." Defendant's wife, Raula, tells the Court that her husband, "is an amazing husband and friend, and an out of this world father, the kindest heart you will ever meet."[3] His sister, Guytta Asmar-Azar told the Probation Department ("Probation") that defendant is a "great father" and defendant's father, in his letter to the Court, also describes Asmar as a "great father." PSR ¶ 33. Raula further informs the Court that ▮ the couple's son, and her husband "were inseparable" and ▮ was Joseph's life and Joseph was and [is] still ▮ hero." Defendant's other sister, Nathalie, writes that her brother "did support me personally in many ways and led me to be who I am now and can say I am a mom and a successful career woman only because of him."

Asmar's closeness with his son however, has caused ▮ to have difficulties dealing with

---

[1] A certificate from the Beirut Bar Association and letters from colleagues and clients are attached collectively as Exhibit A.

[2] Asmar's letter to the Court is attached as Exhibit B.

[3] Letters of support from defendant's family and a photograph of the family are attached collectively as Exhibit C.

his father's sudden and prolonged disappearance. Ms. Asmar writes, "▇ has to be monitored and followed by a psychologist at school to help him deal with the ordeal." *See also* PSR ¶ 34. According to a report from school psychologist Maya Khatar Fakhouri, "▇ is following behavioral therapy, one of the main objectives of which is to cope with his family situation, and to tolerate the changes induced by the sudden disappearance of the father as well as the missing paternal functions which were strongly present and effective in ▇ life."[4] The anguish suffered by defendant's family because of his selfish actions has had a powerful effect upon Asmar. He writes, "[I have] caused them a lot of problems, specially [sic] my son." Additionally, according to his wife, defendant's very young daughter "doesn't even remember her father, it's so sad and hard for me to see her calling my brother daddy." To compound matters, the publicity in Lebanon regarding defendant's arrest caused her employer, a bank, to terminate her from her position. Defendant's elderly parents are of poor health and his current situation has caused them "a lot of pain." PSR ¶ 31. Guytta explains to the Court that defendant's parents not only suffer from their son's absence and the pain it causes his family, but they have assumed the responsibility of providing both financial and emotional support to his wife and children. In fact, the parents sold personal assets in order to shoulder this burden. These circumstances cause defendant unimaginable guilt and shame. As a result, Asmar explains, "U [sic] can be sure Ur [sic] Honor that never in my life will I do anything wrong or bad I learned a very big lesson, and nothing is worth passing a minute without my kids and family." Retribution has already been exacted against Asmar and the rehabilitative process is virtually complete. His experience and hard learned lessons since his arrest in France assures that he will not reoffend.

    When defendant returns to his country, he will continue to contribute to his community. As described above by colleague and the Mayor of a nearby village, Tony Rizkallah, defendant is dedicated to the service of others. Raymond Sleiman, the Mayor of defendant's home Village of Qortada, provided the Court with a letter in which he writes, "Not only a resident and Qortadee, Mr. Asmar is a very important and involved member, known among us for his kind heart, genuine personality and charity work and devotion to our community."[5] As examples of defendant's service to his community, Mayor Sleiman describes for the Court how Asmar planned and helped gather finances for the Village's annual Christmas party so that no child would be left out, headed the campaign to provide vaccinations to the children in Qortada who otherwise would go unimmunized and provided jobs for teens needing to raise funds for college educations. The pastor at Asmar's church, Father Pierre Maroun Abboud, similarly informs the Court, "I testify that [Asmar] is a good person, with high ethics not attached to material possessions doing charity work for our parish and elsewhere." Father Abboud explains that defendant helps the church by dedicating time to assisting with finances and running church owned properties. He further tells the Court that Asmar was once "asked to run for the head of the city council position, which he declined in order to [spare] the village the turmoil of a heated election." Defendant's sister Nathalie informed the Court, "He is missed by many people and families he was helping and supporting financially and morally without bragging about it."

---

[4] A copy of the Report of Psychological Counseling is attached as Exhibit D.
[5] Letters from community leaders, with translations where necessary, are attached collectively as Exhibit E.

Since his extradition to the United States, Defendant has been incarcerated at the Metropolitan Detention Center. ("MDC"). In the year he has been at MDC, he has maintained a clean disciplinary record. PSR ¶ 37. Additionally, as soon as work was available, he seized the opportunity and has served as unit orderly and sanitation crew member. PSR ¶ 37. Asmar has also availed himself of and completed every program for which he was permitted participation including Tutor Training, Resume Writing and Job Interview Skills, Anger Management, Alternatives to Violence, Regular and Advanced Real Body Blueprint and Yoga/Meditation.[6] He is currently enrolled in the Entrepreneurship course and expects to graduate in the next two weeks. Asmar, through his actions while incarcerated, has demonstrated that he takes his situation seriously, follows rules and will do all in his power to better himself and those around him.

Defendant's personal history and characteristics both before and after his arrest in the instant case indicate that many of the sentencing goals set for in 18 U.S.C. § 3553(a) have already been achieved. Therefore, a sentence below the applicable Guidelines range is warranted in the instant case.



personal information

### HARSH CONDITIONS OF DEFENDANT'S PRE-EXTRADITION INCARCERATION

Prior to his extradition to the United States, Asmar was incarcerated pursuant to his arrest in the instant case at the Fresnes from October 8, 2015 to December 23, 2016. During this 14 and a half months, defendant endured deplorable conditions and was physically assaulted on several occasions. PSR ¶ 36, 37. In his letter, defendant describes his experience at Fresnes as follows, "Like living in hell inside the room for 24 hours, 3 times I was assaulted by inmates inside the room but I could not tell. The jail was violent and blood flowing every where [sic] from frights and my asthma problem was so strong over there and I had till now a very big skin problems

---

[6] Certificates of Completion for each of these programs are attached as Exhibit F.

4

because of the rats in the jail and the unclean and unsafe living conditions."

Recent literature and studies corroborate defendant's account. The European News agency, RFI, recently published a report about Fresnes. The December 14, 2016 report recounts that the French Chief Inspector for Prisons, Adeline Hazan, after an inspection of Fresnes, informed the French Justice Minister, Jean-Jacque Urvoas, that the conditions at the jail are "inhuman or degrading" and that a "permanent climate of tension" exists. RFI Europe, "French Prison Conditions 'Inhuman and Degrading', Official Report", http://en.rfi/europe/20161214-french-prisons-conditions-inhuman-and-degarding-official-report.[7] The news agency described that the conditions at Fresnes are dire. "The situation has deteriorated since the [Inspector's] last visit two years ago …". *Id.* The Report continues, "Understaffing and overcrowding in a 19th century building that, according to Hazan, urgently needs renovation" has led to (1) overcrowded cells with toilets that "lack privacy and hygiene", (2) dirty and too small visiting rooms that are often a place for "brutality and violence", (3) rat infested courtyards that include "the persistent smell of their fur, their excrement and their corpses being added to the smell of piles of rubbish", (4) rat urine "leaking through artificial ceilings in the cells" and rat bites leading to disease, (5) the common occurrence of bedbugs and cockroaches, (6) "rigid, incomprehensible, and brutal discipline", and (7) frequent violent incidents between prisoners due to the lack of supervision. *Id.* Another media account about the same official inspection stated that an inmate, quoted within the report, told the inspector, "We are infested with bedbugs, bitten every night on the face, on the neck, the shoulders, the back, the legs and arms." NewsFrance@thelocal, "Rats, Bedbugs and Overcrowding, Watchdog Slams French prison", https://www.thelocal.fr/20161215/rats-bedbugs-and-overcrowding-watchdog-slams-french-prison. An artist that ran a program at Fresnes posted in his blog that he was overwhelmed by the response to his work program. However, he quickly learned that inmates preferred unpaid work to staying in their cells because "3 people live in a cell, which is 3x4 meters, which includes an open toilet. They spend most of their day in their beds as there is no space for all of them standing." "Report from the Prison de Fresnes", http://www.blog.pedroreyes.net/?=57. In October of 2016, France 24 news agency reported on complaints registered by an attorney that visited clients at Fresnes on a weekly basis, Maud Shchlaffmann-Amprino. Ms. Shchlaffmann-Amprino relayed observations similar to the findings of the Chief Investigator and recounted, "One client told me he sleeps on a chair with his head on his table because his mattress in completely infested with bedbugs" and that rubbish is infrequently collected leading to rat infestation so severe that prisoner hear the rats fighting at night and find dead rats in the yard in the morning. "Overpopulated French prison 'Infested' with Rats and Bed Bugs", http://www.france24.com/en/21061003-overpopulated-french-prison-infested-with-rats-and-bed-bugs. The May 2017, Penn Undergraduate Law Journal reported that Fresnes "was put on alert due to 'inhuman conditions,' caused by prison overcrowding, the proliferation of rodents and the 'constant climate of violence'." Penn Undergraduate Law Journal, May 2, 2017, "Overcrowding in the French prison System: A Need for Reform?", http://www.pulj.org/the-roundtable/overcrowding-in-the-french-prison-system-a-need-for-reform.

These inhuman conditions are obviously unacceptable in the United States or any

---

[7] Copies of all cited articles are attached are attached collectively as Exhibit G.

country. The fact that Asmar was subject to these conditions for an extended period of time is a significant part of his personal history and circumstances. The time he spent at Fresnes was torturous compared to his incarceration at the MDC. Other similarly situated defendants were not subject to these horrors. For this reason, Asmar respectfully submits that his incarceration at Fresnes is a sentencing factor that weighs heavily in favor of a below the Guidelines sentence pursuant to 18 U.S.C. § 3553(a).

## CONCLUSION

For the above stated reasons, defendant Joseph Asmar respectfully submits that a sentence below the applicable Guidelines ranges is reasonable and just under the sentencing factors set forth in 18 U.S.C. § 3553.

Thank you for Your Honor's consideration of this letter.

Very truly yours,

*Sanford Talkin*
Sanford Talkin

*Aaron Altman*
Aaron Altman

cc:   AUSA Jonathan Lax (by ECF & email)
      AUSA Gina Parlovecchio (by ECF & email)

6